# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 17-cr-60093-BLOOM

UNITED STATES OF AMERICA,

v.

TIMOTHY JOHN BEVERLY

Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR MOTION FOR NEW TRIAL

**THIS CAUSE** is before the Court upon Defendant Timothy John Beverly's ("Defendant") Motion for Judgment of Acquittal Notwithstanding the Verdict or Alternatively for a New Trial, ECF No. [79] ("Motion"). The Court has reviewed the Motion, all opposing and supporting filings, the record in the case, and is otherwise fully advised. For the reasons that follow, Defendant's Motion is denied.

## I.    BACKGROUND

At the conclusion of a two-week trial, a jury in Miami-Dade County convicted Defendant of committing wire fraud in violation of 18 U.S.C. § 1343 (Counts 1 - 4); filing false income tax returns for the years 2010, 2011, 2012, and 2013 in violation of 26 U.S.C. § 7206(1) (Counts 5 - 8), and making false statements to the United States in violation of 18 U.S.C. § 1001 (Counts 9, 11, 12, 14 and 15).[1]  *See* ECF No. [75].  Defendant now seeks a judgment of acquittal or a new trial in the Motion on three separate grounds: (1) the Court erred in allowing IRS Special Agent Moises Assael ("Special Agent Assael") to testify that certain funds constitute "income" that Defendant

---

[1] During oral argument on Defendant's Motion for Judgment of Acquittal at the close of the Government's case in chief, the Government agreed to dismiss Counts 10 and 13.  *See* ECF No. [104] at 60.

should have reported on his tax returns; (2) there was insufficient evidence at trial to support a conviction; and (3) Defendant was unduly prejudiced by the Government's argument that his bankruptcy discharge affected his ability to continue using a net operating loss on his income tax returns. *See* ECF No. [76]. The Government timely filed its Response in Opposition, *see* ECF No. [80], but to date, Defendant has not filed a Reply. Accordingly, the Motion is now ripe for review.

## II. LEGAL STANDARD

### A. Motion for a Judgment of Acquittal Notwithstanding the Verdict

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). As Defendant has done here, **"**[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2).

When deciding a motion under Rule 29, the district court must determine "whether the evidence, examined in a light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *United States v. Williams*, 390 F.3d 1319, 1323–24 (11th Cir. 2004) (citing *United States v. Varkonyi,* 611 F.2d 84, 85-86 (5th Cir.1980)). Thus, the test is whether a reasonable jury could find, beyond a reasonable doubt, that Defendant is guilty of violating the crimes alleged in the indictment. *United States v. Macko*, 994 F.2d 1526, 1532 (11th Cir. 1993). Applying this test, "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 611 F.2d at 1323 (citing *United States v. Gianni,* 678 F.2d 956, 958-59 (11th Cir. 1982) and *United States v. Burns,* 597 F.2d 939, 941 (5th Cir. 1979)). Because a jury may choose among reasonable

constructions of the evidence, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 1324 (quoting *United States v. Young,* 906 F.2d 615, 618 (11th Cir. 1990); *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir. 1983)). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008) (citing *United States v. Byrd,* 403 F.3d 1278, 1288 (11th Cir. 2005)).

### B. Motion for New Trial

Rule 33(a) provides that: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial is "addressed to the sound discretion of the trial court." *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir. 1987). When a motion for new trial is based on claims that the verdict is contrary to the weight of the evidence, "the court need not view the evidence in the light most favorable to the verdict" but "may weigh the evidence and consider the credibility of the witnesses." *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985) (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980) and *United States v. Simms,* 508 F. Supp. 1188, 1202 (W.D. La. 1980)). "If the court concludes that, 'despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.'" *Id.* (quoting *Lincoln,* 630 F.2d at 1319). With that said, a district court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more

reasonable." *Id.* at 1313 (citing *Simms,* 508 F. Supp. at 1202). Instead, it must let the verdict stand unless it finds the evidence preponderates heavily against the verdict so much so that it would cause a miscarriage of justice. *Id.* (internal citations omitted). Because motions for new trial based on the weight of the evidence are disfavored, they are granted sparingly, with caution and only in "really 'exceptional cases.'" *Id.*

## III. DISCUSSION

In support of his Motion, Defendant advances three arguments: (1) the Court erred when it allowed Special Agent Assael, a lay witness, to testify whether certain funds constituted "income;" (2) there was insufficient evidence to support his conviction, and (3) Defendant was unduly prejudiced when the Government argued that his bankruptcy discharge affected his ability to use a net operating loss on his income tax returns. *See* ECF No. [79]. Defendant makes these arguments without differentiating whether they are grounds for a judgment of acquittal notwithstanding the verdict under Rule 29 or grounds for a new trial under Rule 33. The Court interprets the second argument challenging the sufficiency of the evidence as the basis for the renewed request for a judgment of acquittal. As to the request for a new trial, the Court considers whether any of the three grounds listed above warrant trying this case anew.

### A. Motion for a Judgment of Acquittal Notwithstanding the Verdict

Defendant's Motion challenges the sufficiency of the evidence as to all counts of which the jury found him guilty. Specifically, Defendant "readopts and restates the arguments in support of his motion for judgment of acquittal at the close of the Government's case." ECF No. [79] at 2. Consistent with those points, Defendant argues there was insufficient evidence to prove he intended to defraud Matthew Franzak ("Mr. Franzak") or Majestic Jet, Inc. ("Majestic Jet") (collectively the "victims") to convict him of wire fraud in Counts 1 through 4. *Compare*

ECF No. [104] at 50-51 *with* ECF No. [79] at 2.  As to Counts 5 through 8 charging Defendant with filing false income tax returns for the years 2010 through 2013, the Motion states there was insufficient evidence to demonstrate Defendant knew he had a legal duty to report the funds as income because his unfamiliarity with federal tax laws remained uncontroverted.  *See* ECF No. [79] at 2.  This is the same argument he made during trial at the close of the Government's case. *See* ECF No. [104] at 47-49.  Finally, as to Counts 9, 11, 12, 14 and 15, Defendant argues there was no evidence to establish his knowledge of a duty to report funds from aircraft transactions as earnings on his monthly supervision reports to the United States Probation Office ("U.S. Probation").  *See* ECF No. [79] at 2.  During trial, Defendant also raised this identical argument. *See* ECF No. [104] at 49-50.

At the close of the Government's case, this Court heard oral argument on Defendant's Motion for Judgment of Acquittal and denied it as to all counts with the exception of Counts 10 and 13.  In this post-trial Motion, Defendant fails to raise any new arguments for the Court's consideration, relying upon and repeating the same contentions previously considered and rejected.  *See United States v. Mulherin*, 529 F. Supp. 916, 923 (S.D. Ga. 1981), *aff'd,* 710 F.2d 731 (11th Cir. 1983) (holding that post-verdict renewed motion for judgment of acquittal raising the same arguments made during the *ore tenus* motion at trial "would not cause the Court to reconsider its prior rulings.").  Finding that Defendant has not raised any new arguments that warrant reconsideration of the prior ruling, the Court denies Defendant's renewed request for a judgment of acquittal for the same reasons announced on the record during trial.  *See* ECF No. [104] at 60-63.

**B.  Motion for New Trial**

As explained above, Defendant raises three arguments in support of a new trial.  The Court will address each of these arguments in turn to determine whether this is one of those truly exceptional cases in which this rare remedy should be granted.

**1.  Testimony of Special Agent Assael**

In support of his request for a new trial, Defendant first renews the arguments raised in his Amended Motion to Exclude Witness Testimony Regarding Income.  *See* ECF Nos. [47] and [56].  In essence, he argues that Special Agent Assael should have been precluded from testifying that certain financial transactions constituted "income" for purposes of proving Counts 5 through 8 of the Superseding Indictment.  *Id.* It is Defendant's position that the question of whether certain transactions qualified as "income" was the "ultimate legal issue" for the jury to decide.  *Id.*  Ruling on this Motion during trial, the Court stated as follows:

> THE COURT: I had an opportunity to review the motion and the response, as well as the reply. Is there any further argument or do you want to stand on the motion? Because I think, when the Court reviews the jury instructions, it appears that the issue with regard to the definition of income is going to require that either the parties come up with an agreement as to what constitutes income, but certainly the question in this case is not taxable income. And I believe that much is being made with regard to the definition of tax income and the Department of Justice's Criminal Tax Manual. And I believe that the definition should be along the line of an ordinary definition of the money or other form of payment that one receives periodically from employment, business, investment, royalties, gifts and the like. And that's a standard definition, not what the tax code considers to be income.
>
> And with that understanding, and with regard to the motion in limine, it would appear that this witness certainly can testify as to what he believes was received by Mr. Beverley. And I do not believe that that invades the province of the jury because it focuses on facts that may or may not be known to this witness. So with regard to whether transactions are income is ultimately not a legal issue that the jury must resolve, but a factual one. And I believe that it relates directly to whether false statements or written declarations were false, were material, and were willfully made by the Defendant. So I am denying the Defendant's motion to exclude the witness regarding income.

*See* ECF No. 100 at 212-213. By relying solely upon the arguments raised in his pre-trial motion, Defendant does not present any ground for the Court to reconsider its *in limine* ruling. Nor does the Defendant attempt to demonstrate how the testimony elicited from Special Agent Assael was inadmissible and prejudicial in light of the parties' agreed-upon definition of "income" in the jury instructions. For these reasons, the Court finds no error in its denial of Defendant's Amended Motion to Exclude Witness Testimony Regarding Income. As such, this argument fails to warrant a new trial.

### 2.    Weight of the Evidence

Next, the Motion states there was insufficient evidence to support his conviction. Defendant's argument on this point is the same one presented at trial during his Motion for Judgment of Acquittal. Because Defendant challenges the sufficiency of the evidence, the Court will examine the evidence as to each count to determine whether it "heavily preponderates against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Martinez*, 763 F.2d at 1313.

### a)    *Wire Fraud Counts*

In the Superseding Indictment, the Government charged the Defendant with four counts of wire fraud in violation of 18 U.S.C. § 1343 for "knowingly and with intent to defraud, devise, and intend [sic] to devise, a scheme and artifice to defraud and to obtain money from [Matthew Franzak] and Majestic Jet, by means of materially false and fraudulent pretenses, representations and promises, and by omissions of material fact, and for the purpose of executing the scheme and artifice to defraud, and to obtain money, did knowingly transmit, and cause to be transmitted, by means of wire communications in interstate commerce, certain writings, signs, signals, pictures and sounds." *See* ECF No. [70] at 3-4. More specifically, the Superseding Indictment alleges

that Defendant earned a salary and generated commission payments from airplane purchases and sales while employed by Majestic Jet and diverted the commission payments earned by his employer from the sale of airplanes by directing escrow agents to send funds into nominee corporate bank accounts of other entities controlled by Defendant's associates.  *Id.* at 4. Defendant also allegedly wrote checks and transferred funds out of his employer's bank accounts to pay for his personal expenses, such as boat maintenance and rent, and allegedly transferred monies directly from his employer's bank account to escrow agents to purchase aircraft in the name of Majestic Jet and MJJJ while retaining some or all of the sales commissions.  *Id.*  In total, the Superseding Indictment alleges that Defendant obtained money in the amount of approximately $1,834,000.  *Id.* at 5. The Court now examines the evidence presented to the jury to determine whether grounds for a new trial exist.

### *(1)    Count 1*

In Count 1, the Government charged Defendant with wire fraud involving a $15,000 wire transfer made on April 20, 2012 from an Aero-Space Reports, Inc. ("Aero-Space Reports") account ending in #8175 at Bank of Oklahoma in Oklahoma City, Oklahoma to a T.T. Yacht Sales, Inc. account ending in #4257 at Florida Shores Bank in Pompano Beach, Florida.  *See* ECF No. [70] at 5.  The evidence introduced at trial included a wire transfer authorization as well as incoming wire details dated April 20, 2012 reflecting a transfer from the account of Aero-Space Reports in the amount of $15,000 to "TTY Sales."  *See* ECF Nos. [78-277] and [78-278]. Similarly, the Government presented documentation revealing several other wire transfers from the Aero-Space Reports account to the account of "TTY Sales" in amounts of $10,000 on January 1, 2012, $12,000 on December 4, 2012, $15,000 on May 7, 2012, and $15,000 on May 24, 2012.  *See* ECF Nos. [78-117], [78-118], [78-274], [78-275], [78-279], [78-280], [78-281],

[78-290]. Christina Hancock, the escrow agent for Aero-Space Reports, testified that Defendant instructed her to make these wire transfers to "TTY Sales." *See* ECF No. [98] at 40, 45, 50-51. Consistent with this testimony, there were several emails admitted into evidence in which Defendant instructed Ms. Hancock to issue the wires transfers to "TTY Sales." *See* ECF Nos. [78-170] and [78-112]. Ms. Hancock also testified that she would not have disbursed funds for non-aircraft-related expenditures as it is industry standard to only disburse escrow funds for aircraft-related transactions. *See* ECF No. [47] at 46-47.

Other exhibits in evidence reflect checks written by Defendant from the account of Majestic Jet International LLC made payable to "TTY Sales" in the amount of $10,500 on April 19, 2011, *see* ECF No. [78-27] at 595, and in the amount of $10,000 on March 10, 2012, *id.* at 598. At trial, Marvin Weibe, owner of TT Yacht Sales, testified that he never referred to his business as "TTY Sales" but rather referred to it as TT *Yacht* Sales, Inc. and that Defendant was a co-signer on the company's bank account. *See* ECF No. [98] at 208, 215-216. There was also evidence that, in December of 2014, after Defendant's probationary period was over[2] and after he ceased working for Majestic Jet, he issued a check in the amount of $12,885 and another one in the amount of $35,000 to "TT *Yacht* Sales." *See* ECF No. [78-27] at 599 (emphasis added).

Defendant's argument is that there was insufficient evidence demonstrating his intent to defraud Mr. Franzak and Majestic Jet. However, knowledge and intent may be proven through circumstantial evidence. *See Williams*, 390 F.3d at 1325 ("This Court has previously held that circumstantial evidence may prove knowledge and intent."); *Macko*, 994 F.2d at 1533 (finding that juries may consider devious behavior, such as secretive or covert behavior falling short of evidence of actual knowledge, along with other circumstantial evidence to infer the defendant's

---

[2] Probation Officer Teresa Graham testified that supervision over Defendant ended in October of 2012. *See* ECF No. [97] at 36.

specific intent). In this case, the Court finds that the Government presented circumstantial evidence from which the jury could infer Defendant's intent to defraud the victims. Specifically, there was evidence that, during the time Defendant worked for Majestic Jet, he issued multiple wire transfers and checks to "TTY Sales" even though the company name was TT Yacht Sales, Inc. and this yacht company was not in the aircraft industry. This evidence coupled with Ms. Hancock's testimony that disbursements could only be for aircraft-related expenses allows an inference to be drawn that Defendant issued wire instructions for payment to "TTY Sales" instead of TT Yacht Sales, Inc. to conceal the nature of the transfers. In contrast, other evidence revealed that, after Defendant's probationary period was over and after he ceased working for Majestic Jet, he issued checks payable to "TT Yacht Sales." From this circumstantial evidence, an inference can be made that Defendant knowingly used the name "TTY Sales" to conceal the wire transfers and thus defraud the victims. Based on the Court's review of the record, it concludes that the evidence does not heavily weigh against the verdict as to Count 1.

### (2)    *Count 2*

Count 2 charged Defendant with wire fraud for a $60,000 wire transfer on May 24, 2012 from the same Aero-Space Reports bank account in Oklahoma City, Oklahoma to Global One International LLC's ("Global One") account ending in #3788 at Florida Shores Bank in Miami, Florida. *See* ECF No. [70] at 5. Consistent with the charges, Exhibits 18M and 18N revealed a wire transfer in the amount of $60,000 on May 24, 2012 from Aero-Space Reports to Global One. *See* ECF Nos. [78-115] and [78-116]. Defendant's girlfriend, Karla Rodriguez, testified that she was the owner of Global One, a marketing and public relations business, and that Defendant suggested she open a bank account for Global One with Florida Shores Bank. *See* ECF No. [100] at 86 and 88. At trial, Ms. Rodriguez acknowledged that a $60,000 wire transfer

was made into Global One's bank account but testified she did not know that this transfer would be made or why it was made. *See* ECF No. [100] at 110-111. The same holds true for other wire transfers in the amount of $40,000 from Mark Goldstein, P.A., an aviation attorney for whom she never worked, and other wire transfers in the amounts of $37,500 and $30,000 from Aero-Space Reports. *Id.* at 111-112. Ms. Rodriguez testified that Defendant was directing the wire transfers into Global One's account. *Id.* at 112.

According to Ms. Rodriguez, she eventually stopped asking Defendant why money was being transferred because she was not receiving satisfactory answers and did not want to fight with her boyfriend any longer. *Id.* at 114-115. Although she admitted that Defendant told her the wire transfers were for her marketing efforts, she did not agree. *Id.* at 194; ECF No. [101] at 40. She testified she had no experience marketing or selling aircraft as her experience was limited to the yacht industry and she denied actively marketing aircraft sales. *See* ECF No. [100] at 164 and 189. Her assistance with Defendant's airplane sales was limited to translating, sending emails, and relaying information in Spanish per her boyfriend's request to his non-English speaking contacts. *Id.* at 154-164, 168, 172-174.

Based on the Court's review of the record, it finds the evidence adequately supported the verdict. Although Defendant presented email evidence that he made wire transfers to Global One's bank account in exchange for Ms. Rodriguez's marketing services, the Government presented evidence that Ms. Rodriguez was not involved in marketing aircraft sales, that Defendant directed the wire transfers, that Ms. Rodriguez did not understand why Defendant was directing wire transfers into her business's bank account, that Defendant told her to open this account, and that Global One was not involved in the aircraft industry. From the foregoing evidence, a rational jury could infer that Defendant intended to defraud the victims when he

directed the $60,000 wire transfer to Global One. Thus, as to Count 2, the evidence does not heavily preponderate against the verdict.

*(3)     Count 3*

Count 3 asserts a charge of wire fraud for the transfer of $75,000 in funds on May 24, 2012 from the same Aero-Space Report's account in Oklahoma City, Oklahoma to Aircraft Completions Center, Inc.'s ("Aircraft Completion Center") account ending in #9127 at Wachovia/Wells Fargo Bank in Pompano Beach, Florida. *See* ECF No. [70] at 6. Evidence of the wire transfer at issue is located at Exhibits 18K and 18L, revealing a $75,000 wire transfer made on May 24, 2012 from Aero-Space Reports to Aircraft Completions Center. *See* ECF Nos. [78-113] and [78-114]. The owner of this company, Theresa Prohaska, testified that she and her husband formed this entity to expand their family business beyond interior aircraft maintenance. *See* ECF No. [99] at 129-130. However, they never expanded the business as intended because they did not have the resources. *Id.* The company never entered the aircraft sales business either. *Id.* at 131. Because Aircraft Completions Center was not doing any business at all, it did not have any income. *Id.* at 153. Despite this, Ms. Prohaska testified that several wire transfers related to aircraft sales were made into the company bank account in the amounts of $91,666.67, $76,550, $50,000, and $75,000 and that all of this money belonged to Defendant. *Id.* at 132-134, 136-137, 141-142, and 153.

The Court concludes that the Government presented circumstantial evidence of a scheme to defraud the victims. During trial, there was sufficient evidence to demonstrate that Defendant diverted funds from aircraft sales to Aircraft Completions Center even though this entity was not conducting any business and was not involved in the sales. Because the Court finds that the evidence as to Count 3 does not heavily preponderate against the verdict, the request for a new

trial is denied.

*(4)    Count 4*

The last wire fraud count involved a November 19, 2012 wire transfer of $12,000 in funds from Powell Aircraft Title Service LLC's ("Powell Aircraft Title") Bank of America account ending in #0017 in Oklahoma City, Oklahoma to Scott Lochner's account ending in #0692 at Bank of America in Pembroke Pines, Florida. *See* ECF No. [70] at 6. Among the documentary evidence presented at trial were the wire transfer details evidencing a $12,000 transfer on November 19, 2012 from the account of Powell Aircraft Title, an escrow company, to Scott Lochner and an email from Defendant to escrow agent, Kim Thompson, requesting that $12,000 be wired to Mr. Lochner. *See* ECF Nos. [78-141] and [78-142]. Also within the same email chain, Ms. Thompson informed Defendant that the balance of funds held in escrow "will need to either be used for an aircraft transaction" or will need to be wired to Defendant. *See* ECF No. [78-141]. In response, Defendant stated, in part, "I just need to pay Scott for another deal we did." *Id.* Mr. Lochner, who was Defendant's landlord at the time, testified that this wire transfer was not related to an aircraft transaction, the sale of an aircraft or the sale of aircraft parts, but was instead Defendant's quarterly payment of his rent while residing at a property in Pompano Beach, Florida. *See* ECF No. [101] at 48-50, 55-58. Mr. Franzak, as the owner of Majestic Jet, testified that the company had not reached an agreement with Defendant to pay for his rent and he did not know Mr. Lochner. *See* ECF No. [101] at 147-148. Had an agreement been reached whereby Majestic Jet paid for Defendant's rent as part of his compensation, Mr. Franzak indicated such payments would have been processed through accounting. *Id.* at 148.

Here, there was sufficient evidence from which the jury could find that Defendant intended to defraud Mr. Franzak and Majestic Jet when: (1) he asked Ms. Thompson to wire

money to Mr. Lochner and was reminded that such wire transfers could only be for aircraft-related transactions; (2) he then sent a follow-up email requesting the transfer to Mr. Lochner "for another deal [they] did," suggesting the transfer was for an aircraft-related deal even though it was a rent payment, and (3) he had no agreement with Majestic Jet to pay for his rent. Based on this evidence, the Court concludes the jury's verdict was adequately supported and Defendant has failed to satisfy his burden for a new trial.

### b) *Filing a False Tax Return*

The Government also charged Defendant with four counts of filing a false tax return in violation of 26 U.S.C. § 7206(1). *See* ECF No. [70] at 6. Specifically, the Superseding Indictment alleges that Defendant willfully filed United States Individual Income Tax Returns on IRS Form 1040 and related Scheduled for the years 2010, 2011, 2012, and 2013, which Defendant did not believe to be true and correct in that he reported certain amounts of other income on line 21 knowing that such income was substantially greater. Defendant argues there was no evidence that he knew he had a legal duty to report the money at issue as income in his annual tax returns. *See* ECF No. [79] at 2. In support of this argument, Defendant points out that his unfamiliarity with federal tax laws. Moreover, he argues that his lack of knowledge as to his duty to report the money as income was uncontroverted at trial. *Id.* Relying upon the Supreme Court opinion of *Cheeks v. United States*, Defendant argues the Government failed to prove willfulness, meaning that "the law imposed a duty on the [D]efendant, that the [D]efendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheeks v. United States*, 498 U.S. 192, 201 (1991). Because Defendant's argument applies to Counts 5 through 8, the Court will jointly address the sufficiency of the evidence on willfulness as to all four counts.

Starting with Defendant's argument that there was no evidence he knew and understood

the tax laws, the Court finds such direct evidence is not necessary to prove willfulness. Evidence of willfulness "is ordinarily circumstantial, since direct proof is often unavailable." *United States v. Kim*, 884 F.2d 189, 192 (5th Cir. 1989) (citing *United States v. Schafer,* 580 F.2d 774, 781 (5th Cir.), *cert. denied,* 439 U.S. 970 (1978)). Willfulness can be proven through circumstantial evidence, such as "a failure to report a substantial amount of income, a consistent pattern of underreporting large amounts of income, the spending of large amounts of cash that cannot be reconciled with the amount of reported income, or 'any conduct, the likely effect of which would be to mislead or to conceal.'" *Id.* (internal citations omitted); *United States v. Walker*, 896 F.2d 295, 297–98 (8th Cir. 1990) (quoting *Spies v. United States,* 317 U.S. 492, 499 (1943)) (stating that willfulness can be inferred from "conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."). Thus, "it is well established willfulness cannot be inferred *solely* from an understatement of income." *United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999) (emphasis added).

When proving willfulness, circumstantial evidence of conduct may be used regardless of whether the conduct also serves another purpose, including the concealment of another crime like embezzlement. *Guidry*, 199 F.3d at 1157 ("Concealment of income can have more than one purpose. Such activity can show a desire to conceal the theft from the employer, and it can tend to show a purposeful attempt to conceal such income from the Internal Revenue Service."). As to the question of whether funds obtained through embezzlement or other fraudulent means constitute income, the law is clear that those funds are income to the recipient. *James v. United*

*States*, 366 U.S. 213 (1960); *United States v. Harris*, 942 F.2d 1125, 1134 (7th Cir. 1991).

The Court finds that there was sufficient circumstantial evidence from which a rational finder of fact could determine that Defendant knew he had a legal duty to report the funds at issue to the IRS on his income tax returns. Special Agent Assael testified that in 2010, Defendant had unreported income in the amount of $246,724 in line 21 of his return and in 2011, Defendant had unreported income totaling $1,013,000 in line 21. *See* ECF No. [103] at 72; ECF No. [104] at 22-23. In the following year, 2012, there was evidence of unreported income in the amount of $310,981, and in 2013, Defendant had unreported income totaling $694,540.92. *Id.* at 73. Of this latter amount, Special Agent Assael testified that approximately $500,000 should have appeared in line 17 of Defendant's return and approximately $100,000 should have appeared in line 21. *Id.* at 74-75. In total, the Government introduced evidence that Defendant underrepresented income exceeding $1.8 million on line 21 of his tax returns over the course of four years. Comparing the amount of reported income to unreported income, the difference was significant. For example, in 2010, Defendant's reported income was $59,000 while the amount of unreported income was *four times* this amount. In 2011, his reported income was $81,667 with an unreported income *twelve times* that amount. The figures for 2012 revealed more than *three times* the amount of unreported income when compared to his reported income of $85,000. Evidence of failing to report a substantial amount of income and evidence demonstrating a pattern of underreporting large amounts of income, such as the evidence presented at trial in this case, constitutes circumstantial evidence of willfulness. *Guidry*, 199 F.3d at 1157. The Court finds that the evidence submitted at trial did not heavily preponderate against the jury's finding that Defendant willfully filed false income tax returns for the years 2010 through 2013. As such, Defendant's request for a new trial as to Counts 5 through 8 is denied.

### c)    *False Statements to the United States*

The Superseding Indictment alleges that Plaintiff made false statements to the United States in violation of 18 U.S.C. § 1001.  *See* ECF No. [70] at 8.  Counts 9, 11, 12, 14, and 15 allege that Defendant knowingly and willfully made and used false writing and documents when completing and submitting his Monthly Supervision Reports to U.S. Probation.  *Id.*  In the Motion, Defendant argues that there was insufficient evidence to support his conviction for false statements to the United States because "there was no evidence to establish that Mr. Beverly understood that funds from aircraft transactions in March, May, June, August, and October of 2012 were required to be reported as 'earnings' in his Monthly Supervision Reports."  *See* ECF No. [79] at 2.  Applying the same willfulness standard previously articulated, the jury was free to consider circumstantial evidence as to whether Defendant knew he had a legal duty to report the income in his Monthly Supervision Reports, such as any failure to report a substantial amount of income or a pattern of underreporting large amounts of income.

During trial, there was evidence that Mr. Beverly had been ordered to pay $18 million in restitution and was required to make monthly payments to U.S. Probation toward paying off the restitution judgment.  *See* ECF No. [96] at 236-237.  Such monthly payments were initially calculated as 10 percent of his gross income.  *Id.* at 237.  Every month, Defendant was required to submit his paycheck stubs as well as Monthly Supervision Reports, which included information about his net and gross income for the prior month, other income coming into his possession, bank account information, and any expenditure above $500.  *Id.*  In April of 2010, Officer Theresa Graham ("Officer Graham") conducted a financial analysis of Defendant and determined that his gross earnings were $4,333 a month, making his monthly restitution payment $433.  *See* ECF No. [97] at 22-25.  In July of 2010, Officer Graham reassessed Defendant's

financial condition based on his lifestyle and new living arrangements, increasing the amount of restitution payments from 10 percent to 15 percent of his gross earnings. *Id.* at 27.

In February of 2011, Officer Maria Pizzi took over Defendant's supervision and oversaw his submission of his Monthly Supervision Reports. *See* ECF No. [99] at 209; ECF No. [100] at 12-13. The March of 2012 report reflected net earnings from employment in the amount of $5,587.30. *See* ECF No. [77-359]. Defendant's Monthly Supervision Reports for May, June, August, and September of 2012 all reflected net monthly income in the amount of $5,417.37. *See* ECF Nos. [77-361]; [77-362]; [77-364]; and [77-365]. In contrast, the Government presented evidence through Special Agent Assael that Defendant received significantly more income than that reported on these monthly statements. In 2012, he testified that Defendant had unreported income in the amount of $310,981, which averages approximately $25,915.08 per month. This sum does not include the $5,417.37 in income listed in the Monthly Supervision Reports. Defendant's monthly income was six times the amount that he reported each month. In addition, there was evidence that Defendant repeated this pattern of underreporting for five months. The Government also presented evidence that Defendant was paying off $18 million in restitution and that any increase in income would increase the amount he paid and could trigger a reassessment of his financial ability to pay a greater percentage of gross income. Evidence of Defendant's failure to report a substantial amount of income, a five-month pattern of underreporting large amounts of income, and the financial incentive to keep reported earnings the same in light of the restitution payments leads to a rational inference that Defendant acted willfully when he failed to report this income on his Monthly Supervision Reports. As such, Defendant's request for a new trial as to Count 5 through 8 fails.

With regard to Count 11, Defendant raises a specific argument about his income in May

of 2012. He argues that, "as to Count 11, Special Agent Assael testified that for the month of May, Mr. Beverly had negative income of $160,480.69." *See* ECF No. [79] at 2. However, the Court's review of the testimony does not support this assertion. During cross-examination, Defendant asked Special Agent Assael one question on this topic while reviewing a chart of unreported income. *See* ECF No. [103] at 68. He was asked: "Q. Now, we see positive numbers until we reach number 18, N52N aircraft. We have a negative number of $160,480. What does that mean?" *Id.* In response, Special Agent Assael stated: "A. That means that at the end of the day, Mr. Beverly lost money on that investment of that airplane." *Id.* The Court's review of this witness's testimony does not reveal any statement admitting that Defendant had negative income in May of 2012. Rather, the testimony is that he had negative income for this specific aircraft transaction.

The record contains abundant evidence from which the jury could have concluded that Defendant had significant amounts of unreported income during May of 2012. Specifically, Special Agent Assael testified that Defendant had $50,000 in income on May 21, 2012 for a "book transfer f/b/o N40ND," which Defendant eventually used to purchase a 2007 Robalo boat, and another $250,000 in income on May 24, 2012 in a "Transfer TBD for MJJJ, LLC," which he explained was a transfer for the "TBD account for Mr. Beverly." *See* ECF No. [78-104]; ECF No. [102] at 107-108. Of this $250,000 transfer, $15,000 was transferred to TT Yacht Sales, $75,000 was transferred to Aircraft Completions Center, and $60,000 was transferred to Global One – transactions discussed above in the wire fraud section. *Id.* Special Agent Assael also testified that Plaintiff received income in the form of a $15,000 wire transfer to TT Yacht Sales on May 7, 2012. *See* ECF Nos. [77-279], [77-280]. Thus, there was sufficient evidence from which the jury could have concluded that Defendant underreported his income for May of 2012

in his Monthly Supervision Reports to U.S. Probation.

In sum, the Court finds there was sufficient evidence to support the jury's verdict as to all counts on which Defendant was convicted. Defendant's request for a new trial is denied.

### 3. Effect of Bankruptcy Discharge on the Net Operating Loss

Finally, Defendant seeks a new trial based on the Government's closing argument. According to Defendant, the Government's statement that his bankruptcy discharge affected his ability to use an $8 million net operating loss on his income tax returns was unduly prejudicial. During trial, Defendant made an *ore tenus* motion seeking to preclude the Government from arguing as a matter of law that Defendant's bankruptcy discharge negated the use of a net operating loss on his income tax returns. *See* ECF No. [104] at 68. In response, the Government explained that its argument would be limited to Defendant's failure to make a full and complete disclosure of his bankruptcy discharge to his tax return preparer when arguing the element of willfulness and lack of good faith. *Id.* at 69. Following the Government's response, Defendant clarified that the Government can make the argument but "not with the conclusion that bankruptcy equals discharge of the [net operating loss] as a matter of law." *Id.* at 70. The Court denied the motion, reasoning that the question of whether Defendant concealed the discharge is a question of fact that cannot be granted as a matter of law. *Id.*

During closing argument, the Government made the following argument with regard to Defendant's bankruptcy:

> There's also the bankruptcy status. You remember Mr. Prothro said that he had to attach a statement to the tax return, and that was in Government's Exhibit 35A. And he basically put a disclaimer -- you can read the statement, but essentially, it said that because of the uncertainty concerning the net operating loss and the bankruptcy of Mr. Beverley and Tyler Jet, LLC -- it doesn't say anything about TJ Motor Sports or some other company that Mr. Beverley had operated when Mr. Bailes was his return preparer. It talks about Tyler Jet and Mr. Beverley.

Nevertheless, not knowing what happened with the bankruptcy, they were making this disclosure to the Internal Revenue Service.

Now, you heard the stipulation. Mr. Beverley knew that he had been discharged in bankruptcy. And you heard Mr. Prothro up there saying each year that they prepared returns they would contact Mr. Beverley: "Hey, anything going on with the bankruptcy?" "No. Same old, same old. Haven't heard a word. Tried to get ahold of the trustee. Can't get him. Can't reach anybody. We don't know what's going on with the bankruptcy."

And Mr. Beverley carried on this charade for years. And it got to the point, Ladies and Gentlemen, where by the time Lazaro Perez came on the scene to prepare the 2013 return, he simply relied upon what Mr. Prothro had done in the prior year and just went the extra step in contacting the Internal Revenue Service to verify that there was a multimillion-dollar net operating loss that had been reported to the service, and it was. So he just reported on that return and just carried this fraud further.

ECF No. [104] at 113-114.

In the Motion, Defendant objects to the Government's argument, stating the Court erred in allowing it. However, during trial, Defendant agreed that the Government could argue he failed to disclose the status of his bankruptcy discharge to his accountant, Mr. Protho, when arguing good faith and willfulness. This was as long as there was no conclusion that, as a matter of law, the bankruptcy discharge operated to negate his ability to carry forward his net operating loss on his tax returns. *See* ECF No. [104] at 70. The Government's closing argument on this point was consistent with the very argument Defendant conceded the Government could make. At no point in time did the Government argue before the jury that, as a matter of law, the bankruptcy discharge made him unable to use the net operating loss. It simply argued that Defendant knew about the bankruptcy discharge and failed to disclose it to his tax preparers. Thus, the very argument that Defendant contends was erroneously allowed and warrants a new trial was never made during closing arguments. As such, the Court finds this argument is without merit.

## IV. CONCLUSION

Motions for a new trial are granted sparingly and only in truly exceptional cases. After thoroughly reviewing nine days of trial proceedings as well as hundreds of exhibits, the Court concludes that the evidence presented at trial does not preponderate heavily against the verdict and this case does not otherwise present exceptional circumstances that would merit a new trial. It is therefore **ORDERED AND ADJUDGED** that Defendant's Motion for Judgment of Acquittal Notwithstanding the Verdict, or alternatively, for New Trial, **ECF No. [79]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 20th day of February, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of record